UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHARLES M. HAMELINE,

        Plaintiff,

                                                File No.  1:07-CV-69

v.

                                                HON. ROBERT HOLMES BELL

DUANE WRIGHT, et al.,

        Defendants.

_____/

## **O P I N I O N**

        This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff Charles Hameline filed this action against Defendants Deputy Duane Wright and Deputy James O'Rourke alleging violations of his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983, state-law assault and battery, state-law false arrest, and state-law intentional infliction of emotional distress.  Plaintiff alleges that Defendants violated his Fourth Amendment rights by entering his residence and by using excessive force.  Plaintiff seeks summary judgment on his Fourth Amendment claim only as to Deputy Wright. Defendants seek summary judgment as to Plaintiff's § 1983 claim based on qualified immunity, as to Plaintiff's assault and battery claim based on Michigan law permitting officers to use reasonable force in the execution of an arrest, as to Plaintiff's false arrest claim based on the presence of probable cause, and as to Plaintiff's intentional infliction of emotional distress claim based on Plaintiff not having shown the type of conduct required

to establish this tort.  For the reasons that follow, Plaintiff's motion for summary judgment will be denied and Defendants' motion for summary judgment will be granted.

**I.**[1]

At the time of the events underlying this lawsuit Plaintiff was living at his mother's house at 10836 Blue Ridge Lane, Elmwood Township, Michigan.  Plaintiff was formerly a Sergeant in the United States Marines and is currently a student at Michigan State University.  Deputies Wright and O'Rourke are both Deputy Sheriffs in the Leelanau County Sheriff's Department.

On Friday, January 28, 2005, Plaintiff had been working at the Abercrombie & Fitch store at the Grand Traverse Mall in Traverse City.  Plaintiff left the mall at around 9:00 p.m.  Plaintiff then went to a female friend's house in Elk Rapids for about an hour.  After leaving the female friend's house, Plaintiff met up with two male co-workers at a bar in Traverse City.  Plaintiff consumed one to two alcoholic drinks at the bar.  Plaintiff left the bar and drove towards 10836 Blue Ridge Lane.  About one-tenth of a mile from 10836 Blue Ridge Lane Plaintiff's truck slid-off the road.  Plaintiff initially attempted to dig the truck out, but then decided to walk home and get the truck in the morning.  Plaintiff estimated that the truck slid-off the road between 11:30 p.m. and 12:30 a.m.  After arriving at 10836 Blue Ridge Lane, but before the Deputy Wright arrived, Plaintiff consumed at least two alcoholic drinks and at least a half bottle of wine.

[1]Although there are cross-motions for summary judgment, the Court in setting forth the facts has viewed the facts in the light most favorable to Plaintiff.

On Saturday, January 29, 2005, in the early-morning hours it was snowing and Angela Galla was delivering newspapers.  As she was coming from Old Orchard to Blue Ridge Road she saw a snow-covered person pop-up out of a ditch.  The person Ms. Galla saw pop-up was Plaintiff, though she did not identify him at that time.  Ms. Galla stopped and asked Plaintiff if he was okay.  Plaintiff told Ms. Galla that he was okay.  After Ms. Galla turned back onto Mann Road she saw a truck embedded in a snowbank and skid marks on the road from the truck.  Ms.  Galla believed that the truck belonged to Plaintiff because of the footprints in the snow.  Ms. Galla then drove to where she had a cellphone signal and called 911.  Ms. Galla told the 911 operator that based on the position of the truck and the skid marks, she believed the driver of the truck was drunk.  (Dkt. No. 34, Pl.'s Br. in Supp., Ex. 5, Galla Dep. 17:10-13, 29:14-15.)

On Saturday, January 29, 2005, at 3:34 a.m., Deputy Wright was dispatched to the intersection of Fouch and Mann to investigate a vehicle in a ditch.  Deputy Wright arrived at the scene at 3:55 a.m.  After arriving on the scene Deputy Wright confirmed that no one was in the vehicle and noted that the vehicle had Florida license plates.  Based on a check run on the truck's license plates, Deputy Wright learned from dispatch that the truck was registered to Charles Hameline.  Deputy Wright followed the footprints in the snow to 10836 Blue Ridge Lane.  Through a window Deputy Wright observed an individual who matched the description provided by Ms. Galla.

Deputy Wright then approached the front door of 10836 Blue Ridge Lane.  Deputy Wright opened the glass storm door and knocked on the structural door.  Plaintiff opened the structural door that opens into the house.  Deputy Wright smelled intoxicants on opening the door.  Deputy Wright asked Plaintiff if he was Charles Hameline and Plaintiff confirmed the same.  Plaintiff also confirmed that the truck in the snow was his and that he would move it in the morning.  As some point, Deputy Wright placed his foot inside the door to prevent Plaintiff from being able to close the door.  Deputy Wright asked Plaintiff to step outside of the house, but Plaintiff declined.  Plaintiff then attempted to close the door; however, instead of closing, the door bounced off Deputy Wright's foot.  As Plaintiff attempted to back-away from the door, Deputy Wright grabbed Plaintiff's wrist.  Deputy Wright was drawn further into the house as Plaintiff moved away from the door because Deputy Wright did not release his grip on Plaintiff's wrist.  Plaintiff, based on his training as a Marine, moved in a manner that forced Deputy Wright to release his wrist.  Plaintiff then assumed a defensive stance and began yelling at Deputy Wright.  At some point in the altercation Plaintiff's mother came into the room and Plaintiff began yelling at her as well.  Around this time Deputy O'Rourke arrived on the scene and entered the house.  Deputy Wright had not radioed for back-up, but it is the practice of Leelanau County Sheriff's Deputies to automatically provide such back-up if they are not otherwise occupied.

Defendants, with the assistance of Plaintiff's mother, were able to get Plaintiff to sit-down and calm down.  Defendants then had Plaintiff stand-up and he was handcuffed.

4

Defendants arrested Plaintiff for operating while intoxicated; however, prior to this point Defendants had not advised Plaintiff that he was under arrest.  On the way out to the patrol car, Plaintiff and Defendants struggled.  When Defendants attempted to search Plaintiff prior to placing him in the patrol car, Defendants had difficulty getting Plaintiff to move in the manner necessary to search Plaintiff's pockets.  Defendants eventually were able to place Plaintiff in the back of the patrol car.

Plaintiff's arms had been handcuffed behind his back, but while in the back of the patrol car Plaintiff was able to move his hands under his buttocks and then to move one leg through the handcuffs.  Plaintiff did this because the handcuffs were causing him severe pain.  Defendants were inside the house speaking with Plaintiff's mother when this occurred.  Defendants heard a loud noise and returned to the patrol car.  Defendants had Plaintiff get out of the car so that they could re-apply the handcuffs with both of Plaintiff's hands behind his back.

Defendants again struggled with Plaintiff to re-apply the handcuffs.  Defendants removed the handcuffs from one of Plaintiff's wrists.  Plaintiff then moved such that Defendants thought Plaintiff  was going to take a swing at Deputy O'Rourke.  Defendants then took Plaintiff to the ground.  Plaintiff's right-arm was under him after he was taken to the ground.  Defendants ordered Plaintiff to move his arm out from under himself.  Plaintiff could not move his arm because Deputy Wright was on his back and the weight of Deputy Wright prevented him from moving his arm.  Plaintiff repeatedly told Defendants that he

was trying to comply, but that he was unable to move his arm.  Deputy Wright used a pain compliance technique by applying pressure to Plaintiff's hypoglossal nerve, which involved pressing his fingers into certain nerves on Plaintiff's neck/jaw line.  After applying pepper spray, Defendants were able to subdue Plaintiff.  Defendants were unable to get Plaintiff to stand-up, so Defendants dragged him to the patrol car and lifted him into the patrol car.  In the course of the struggle, Deputy O'Rourke received a laceration to his left shin.

Plaintiff was taken to the hospital for a blood-draw in order to determine his blood-alcohol level.  Plaintiff's blood-alcohol level was determined to be 0.12.  Plaintiff did not request medical treatment while at the hospital.

Plaintiff was initially charged with two counts.  Count I charged Plaintiff with felony resisting arrest.  Count II charged Plaintiff with operating under the influence of intoxicating liquor.  In Leelanau County Circuit Court Plaintiff filed a motion to suppress and to quash Count I.  Plaintiff's motion to suppress and to quash was granted by Judge Philip E. Rodgers Jr. of the Leelanau County Circuit Court.  Count II was later reduced to attempted operating while impaired and Plaintiff pleaded guilty to this reduced charge.

Plaintiff alleges that he sustained injuries to his nose and wrists as well as severe emotional distress.  Plaintiff further alleges that his wrists were swollen for two weeks after the incident.  Plaintiff never sought medical treatment for any injuries sustained on January 29, 2005.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the movant carries his burden of showing there is an absence of evidence to support a claim, then the non-movant must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

The standards upon which the Court evaluates a motion for summary judgment do not change simply because the parties present cross-motions.  *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001).  "'The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts.'"  *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)). In considering a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in favor of the non-movant.  *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita,*

475 U.S. at 587).  Nevertheless, the mere existence of a scintilla of evidence in support of the non-movant's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-movant.  *Id.*; *see generally*, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

When the movant has the burden of proof, however, a somewhat different standard applies.  "'[W]here the moving party has the burden – the plaintiff on a claim for relief or defendant on an affirmative defense – his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'"  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)).  "[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'"  *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting 11 James Wm. Moore, et al., *Moore's Federal Practice* § 56.13[1], at 56-138 (3d ed. 2000)).  Thus, "[s]ummary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact."  *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## III.

**A.    Plaintiff's Fourth Amendment Unlawful Entry and Excessive Force Claims**

"Title 42, section 1983 of the United States Code imposes civil liability on those individuals who, acting under color of state law, deprive a citizen of, among other things, his or her federally guaranteed constitutional rights." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 485 (6th Cir. 2007).  In a § 1983 action in which a defendant asserts qualified immunity the court must follow a two-step process in evaluating the defendant's claim of immunity.  *Scott v. Harris*, 550 U.S. --, 127 S. Ct. 1769, 1774 (2007).

> Under this analytical framework, a court must first determine whether the facts, viewed in the light most favorable to the plaintiff, could support a finding that the defendant has violated the plaintiff's constitutional rights. [*Saucier v. Katz*, 533 U.S. 194, 201 (2001).]  If the facts would support a finding of a constitutional violation, the court must also find that the conduct of the defendant violated "clearly established" constitutional rights.  *Id.*  If, however, the plaintiff is unable to establish sufficient facts to support a finding of a constitutional violation by the defendant, the inquiry ceases, and the court must award judgment to the defendant.  *See id.*

*Williams*, 496 F.3d at 485.  Defendants have asserted qualified immunity as to Plaintiff's Fourth Amendment unlawful entry and excessive force claims.

**1.    Qualified Immunity for Plaintiff's Fourth Amendment Unlawful Entry Claim**

**a.    Objective Reasonableness of the Entry**

"The 'chief evil' against which the Fourth Amendment protects is the 'physical entry of the home.'"  *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)).  "The Fourth Amendment requires that

9

searches of the home be reasonable." *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990)). "This reasonableness requirement generally requires that police obtain a warrant based upon a judicial determination of probable cause prior to entering a home." *Id.* (citing *Payton*, 445 U.S. at 585-86).

The Court must determine whether Plaintiff had a reasonable expectation of privacy as he spoke with Deputy Wright at the front door. While a person generally has a reasonable expectation of privacy in his house, "'[w]hat a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.'" *United States v. Santana*, 427 U.S. 38, 42 (1976) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). Plaintiff opened the structural door in response to a knock on the door by Deputy Wright. Plaintiff then briefly spoke with Deputy Wright, but the tone and substance of his answers indicated a general desire to limit the conversation. Plaintiff declined Deputy Wright's request for Plaintiff to come outside of the house. At some point Deputy Wright placed his foot in the doorway. When Plaintiff attempted to close the door he was unable to do so  because of Deputy Wright's foot. Deputy Wright then reached to grab Plaintiff's wrist to prevent Plaintiff from withdrawing himself further into the house.

The facts of the instant case are similar to the facts the Sixth Circuit confronted in *Cummings v. City of Akron*, 418 F.3d 676 (6th Cir. 2005). In *Cummings* the police received a call about a domestic disturbance. *Id.* at 679. Upon arriving at the residence, the alleged victim informed the police officers that the alleged perpetrator was at a neighboring house.

10

*Id.*  The police officers went to the neighboring house, opened the screen door, and knocked on the inside entry door.  *Id.*  The plaintiff-resident of the neighboring house, who was not the alleged perpetrator, came to a window and asked the police officers what they wanted. *Id.*  The officers asked the plaintiff to come to the front door.  *Id.*  The plaintiff came to the front door and partially opened it.  *Id.*  During the conversation one of the police officers placed his feet inside the doorway.  *Id.*  The police officers asked the plaintiff if the alleged perpetrator was inside the house and the plaintiff indicated that he was not.  *Id.*  The  officer with his feet in the doorway asked if he could come inside and the plaintiff denied that request.  *Id.*  During the conversation the police officer with his feet in the doorway detected the odor of marijuana emanating from inside the house and asked "What about the weed?" *Id.*  The plaintiff immediately attempted to close the door, but was unable to do so because the police officer's foot was in the doorway.  *Id.*  The police officers then pushed the door open and fully entered the home.  *Id.*  The police officers attempted to arrest the plaintiff but he resisted, though the police officers were eventually able to subdue the plaintiff and arrest him.  *Id.* at 679-80.  The Sixth Circuit concluded that the plaintiff in *Cummings* had manifested an intent to keep his home private by first talking to the officers through the window, only partially opening the door, and refusing the officers' request to enter the house.  *Id.* at 685.  The court determined that the plaintiff indicated his desire to end the conversation by attempting to close the door.  The Sixth Circuit concluded that the plaintiff had retained the protection the Fourth Amendment traditionally affords a home based on the

plaintiff's manifested intent to keep his home private, so the police officers had intruded into an area protected by the Fourth Amendment when they entered the plaintiff's house. *Id.*

Under *Cummings*, Plaintiff manifested a desire to keep his home private despite having opened the door in response to Deputy Wright's knock. Plaintiff was not standing in the doorway; instead, Plaintiff opened the structural door in response to a knock from Deputy Wright. Deputy Wright had opened the glass storm door to knock on the structural door, much like the police officers in *Cummings* opened the screen door to knock on the entry door. Although Plaintiff was in the entry-way, Plaintiff did not step into the doorframe. Thus, Plaintiff remainded behind the threshold. Plaintiff most clearly manifested his desire to keep his home private by attempting to close the structural door and thereby terminate the encounter with Deputy Wright. Under *Cummings*, Plaintiff had a reasonable expectation of privacy in his house while he spoke with Deputy Wright. Because Defendants entered Plaintiff's home in which he had reasonable expectation of privacy, the Court must determine if the entries were reasonable under the Fourth Amendment. Deputy Wright and Deputy O'Rourke entered the home at different times and under different circumstances, so the Court will analyze the reasonableness of their entries separately.

Deputy Wright was the first to enter Plaintiff's house. Deputy Wright entered the house when he grabbed Plaintiff's arm. Deputy Wright contends that the entry was reasonable because there were exigent circumstances. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are

12

presumptively unreasonable.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting

*Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).  Nevertheless, warrantless entries are permitted

where "exigent circumstances" exist.  *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th

Cir. 2002) (citing *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992)).  "'Exigent

circumstances,' . . . denotes the existence of 'real immediate and serious consequences' that

would certainly occur were a police officer to 'postpone[ ] action to get a warrant.'"

*O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997 (6th Cir. 1994) (second modification in

*O'Brien*) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984)).  The Sixth Circuit "has

explained that the following situations may give rise to exigent circumstances: '(1) hot

pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a

suspect's escape; and (4) a risk of danger to the police or others.'"  *United States v.*

*Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (quoting *United States v. Johnson*, 22 F.3d 674,

680 (6th Cir. 1994)).

Deputy Wright contends that three different exigent circumstances existed that

permitted him to enter Plaintiff's house without a warrant: hot pursuit of a fleeing felon,

imminent destruction of evidence, and a risk of danger to himself or others.  Deputy Wright

contends that two different crimes would have permitted him to enter the house in pursuit

of Plaintiff as a fleeing felon.  First, Defendants contend that Deputy Wright could have

arrested Plaintiff for operation of a vehicle under the influence of alcohol, M.C.L.

§ 257.625(1).  Assuming Deputy Wright had probable cause to arrest Plaintiff for operation

13

of a vehicle under the influence of alcohol, there would not have been exigent circumstances to justify entry into the house because a violation of M.C.L. § 257.625(1) is a misdemeanor. M.C.L. § 257.625(9)(a).   Second, Deputy Wright contends that he could have arrested Plaintiff for assault and battery, M.C.L. § 750.81(1).   Assuming Deputy Wright had probable cause to arrest Plaintiff for assault and battery there would not have been exigent circumstances to justify entry into the house because a violation of M.C.L. § 750.81(1) is a misdemeanor.   Additionally, in *Cummings* the Sixth Circuit held that an assault based on closing a door on a law enforcement officer's foot did not fit within the fleeing felon exception because the crime had not been committed in a public place.   *Cummings*, 418 F.3d at 686.   In *Cummings* the Sixth Circuit indicated that the fleeing felon exception is directed at an individual who commits a crime in a public place and then retreats into a private place. *Id.*   Therefore, Deputy Wright did not have exigent circumstances to enter Plaintiff's house based on his hot pursuit of a fleeing felon.

Deputy Wright next contends that pursuit into the house was justified based on the need to prevent the imminent destruction of evidence.   Deputy Wright bases this contention on the fact that Plaintiff's blood-alcohol level would have continued to decrease with the passage of time.   However, in *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984), the Supreme Court held that the  need to determine a suspect's blood-alcohol level is insufficient to create exigent circumstances to justify a warrantless entry into a home.

Lastly, Deputy Wright contends that he had exigent circumstances to enter the residence based on the threat that Plaintiff posed to other residents of 10836 Blue Ridge Lane. Deputy Wright appears to base this on the contention that Plaintiff may have been a trespasser; however, at his deposition Deputy Wright testified that there were no signs of forced entry or other similar evidence. Deputy Wright did testify that in his experience as a law enforcement officer he is aware of instances when an intoxicated person enters a home in which he does not belong, but Deputy Wright did not offer any specifics as to why Plaintiff was such a trespasser, beyond the fact that Plaintiff was intoxicated. Additionally, Plaintiff's behavior upon arrival does not suggest that he was a trespasser. Plaintiff was talking on the telephone and standing in front of a window with the light on such that a passerby would be able to see him. Moreover, when Deputy Wright arrived Plaintiff did not flee, Plaintiff answered the door. Therefore, Deputy Wright did not have exigent circumstances to entered based on the risk to himself or others.

The Court must now consider Deputy O'Rourke's entry. There is a genuine dispute of material fact as to whether Plaintiff's mother told Deputy O'Rourke that he could enter the house, so the Court must consider whether Deputy O'Rourke had exigent circumstances to enter the residence. When Deputy O'Rourke arrived Plaintiff was yelling at his mother and there was an on-going physical confrontation between Deputy Wright and Plaintiff. Based on those facts, Deputy O'Rourke had exigent circumstances to enter based on the threat Plaintiff posed to his mother and Deputy Wright. Therefore, Deputy O'Rourke's entry into the residence was reasonable under the Fourth Amendment.

### b.    Clearly Established Law

As the Court has determined that when the facts are viewed in the light most favorable to Plaintiff, Deputy Wright's entry into Plaintiff's house was not reasonable under the Fourth Amendment, the Court must now determine whether the law was clearly established at the time that Deputy Wright entered Plaintiff's house.

"Government officials in civil cases are protected from liability if their conduct does not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In inquiring whether a constitutional right is clearly established, a court must look first to decisions of the Supreme Court, then to decisions of the Sixth Circuit and other courts within the Sixth Circuit, and finally to decisions of other circuits.  *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006); *Neague*, 258 F.3d at 507.

The Court first must inquire  whether it was clearly established that Deputy Wright's action exceeded the permissible scope under *Santana* of an arrest at a front door.  On the question of the permissible scope under *Santana* of an arrest at a front door, *Cummings* has the most similar facts.  However, *Cummings* was decided on July 22, 2005, which was over five months after the events surrounding Plaintiff's arrest.  Thus, *Cummings* cannot provide a basis for concluding that Plaintiff's rights were clearly established.  In *Santana* the Supreme Court held that a person who stands in her doorway such that she "was as exposed

16

to public view, speech, hearing, and touch as if she had been standing completely outside her house[,]" lacks Fourth Amendment protection.  427 U.S. at 42.  In *Cummings* the Sixth Circuit did not cite to any earlier Sixth Circuit cases that addressed an individual at his doorway or any specific language in *Santana*.  Plaintiff has not cited any cases prior to *Cummings* that recognize that under certain circumstances an individual who is at the doorway, but who has manifested an intent to keep his home private, retains Fourth Amendment protection in the entryway of his home.

Deputy Wright directs the Court to three cases from outside the Sixth Circuit applying *Santana* to arrests at a front door: *United States v. Vaneaton*, 49 F.3d 1423 (9th Cir. 1995);[2] *United States v. Berkowitz*, 927 F.2d 1376 (7th Cir. 1991); and *United States v. Mason*, 661 F.2d 45 (5th Cir. 1981).  In *Vaneaton* the Ninth Circuit upheld the arrest of a person at the front door of his motel room.  49 F.3d at 1426-27.  The police officers in *Vaneaton* went, in uniform, to the defendant's motel room, knocked on the door without making any

_____

[2]Four months after the events surrounding Plaintiff's arrest, the Ninth Circuit limited the application of *Vaneaton* in *United States v. Quaempts*, 411 F.3d 1046, 1047-48 (9th Cir. 2005).  In *Quaempts* the defendant lived in a small trailer home that was "so small that he could open the front door while lying in his bed."  *Id.* at 1047.  Police officers knocked on the door to the defendant's trailer home and advised the defendant that they needed to speak with him.  *Id.*  The defendant then opened the door while still in his bed.  *Id.*  After the defendant opened the door, the police officers arrested him.  *Id.* at 1048.  The Ninth Circuit held that the absence of Fourth Amendment protection for a doorway recognized in *Santana*, and extended by *Vaneaton*, was inapplicable because the defendant was in his bed, not in the doorway.  *Id.*  The court reasoned that because the defendant "did not take himself outside the physical zone of privacy of the house by going to the threshold of his house or to any other public place, the officers could not make a lawful warrantless arrest."  *Id.* at 1048-49.

17

demands, the defendant opened the door, and upon confirming his identity the police officers arrested the defendant.  *Id.* at 1425.  The Ninth Circuit found the arrest permissible because the defendant had voluntarily opened the door and the police had not used any coercion.  *Id.* at 1427.  In *Berkowitz* the Seventh Circuit held that no Fourth Amendment violation occurs if the "police go to a person's home without a warrant, knock on the door, announce from outside the home the person is under arrest when he opens the door to answer, and the person acquiesces to the arrest."  *Berkowitz*, 927 F.2d at 1386 (citations omitted).  However, the Seventh Circuit also held in *Berkowitz* that the Fourth Amendment would be violated if the law enforcement officers did not announce that the defendant was under arrest before entering the house.[3]  *Id.* at 1386-87.  The court in *Berkowitz* noted that in *Santana* the defendant was standing in the doorway of her own accord, while the defendant in *Berkowitz* had come to the doorway in response to law enforcement officers knocking on the door.  *Id.* at 1388.  In *Mason* the Fifth Circuit upheld the arrest of an individual at his front door under *Santana*.  *Mason*, 661 F.2d at 47. The defendant in *Mason* argued that *Santana* was inapplicable because the police had solicited him to come to the front door.  *Id.*  The Fifth Circuit rejected the defendant's argument that *Santana* was inapplicable and concluded that the arrest was permissible because the defendant was at his front door.  *Id.*

---

[3]The Seventh Circuit addressed these two different fact patterns in *Berkowitz* because there was a factual dispute in the record.  The court analyzed the facts as presented by the government and the facts as presented by the defendant.  Because the court reached different results as to the constitutionality of the entry and arrest under the different versions of the facts, the court remanded the case to the district court to hold an evidentiary hearing. *Berkowitz*, 927 F.2d at 1388.

In the absence of the Sixth Circuit's decision in *Cummings*, the holdings of *Veneaton* and particularly *Mason* would suggest to a reasonable person that Deputy Wright did not violate the Fourth Amendment when he reached into Plaintiff's house to grab Plaintiff's wrist. However, the Seventh Circuit's analysis in *Berkowitz* would suggest to a reasonable person that Deputy Wright violated the Fourth Amendment when he grabbed Plaintiff's wrist because Deputy Wright had not announced that Plaintiff was under arrest and Plaintiff had not acquiesced in the entry and arrest. In consideration of the conflict in the opinions from other circuits and the absence of a sufficiently similar case in the Sixth Circuit prior to January 29, 2005, the Fourth Amendment right that Deputy Wright violated was not clearly established such that a reasonable person would have known of the right prior to the Sixth Circuit's decision in *Cummings*. This conclusion is consistent with the holding in *Cummings* that the applicable Fourth Amendment law was clearly established as of the date of the underlying incident in that case, March 20, 2001, *Cummings*, 418 F.3d at 687, because the plaintiff in *Cummings* had more explicitly manifested an intent to keep his home private. In the absence of such a clear manifestation, the facts of the instant case are too similar to the facts of *Mason* for the Court to conclude that a reasonable person would have known that he was violating the Fourth Amendment by acting as Deputy Wright did.

As the Court has concluded that Deputy Wright is entitled to qualified immunity with regard to the entry itself, the Court need not consider whether he is also entitled to qualified immunity based on the presence of exigent circumstances.

19

2.      **Qualified Immunity for Plaintiff's Fourth Amendment Excessive Force Claim**

"A claim of 'excessive force in the course of making an arrest . . . [is] properly analyzed under the Fourth Amendment's "objective reasonableness" standard.'" *Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007) (modification in *Marvin*) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)).  "In determining the reasonableness of the manner in which a seizure is effected, '[the court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Scott*, 127 S. Ct. at 1778 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).  The "reasonableness" of a particular use of force "'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Williams*, 496 F.3d at 486 (quoting *Graham*, 490 U.S. at 396).  "The 'proper application [of the Fourth Amendment's objective reasonableness test] requires careful attention to the facts and circumstances of each particular  case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Marvin*, 509 F.3d at 245 (modification in *Marvin*) (quoting *Graham*, 490 U.S. at 396).  In addition, "'the definition of reasonable force is partially dependent on the demeanor of the suspect.'" *Id.* (quoting *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004)).

20

Defendants contend that they are entitled to qualified immunity based on the depositions, preliminary examination transcript, and expert report of Professor Darrell L. Ross of Western Illinois University. (Dkt. No. 35, Defs.' Mot., Ex. G, Ross C.V. & Report.) Plaintiff's response to Defendants motion for summary judgment did not specifically address the question of excessive force. Plaintiff attached depositions and other materials to his response, but Plaintiff did not identify any particular materials, much less specific parts of materials, that contradict the basis on which Defendants seek summary judgment on Plaintiff's excessive force claim. Federal Rule of Civil Procedure 56(e)(2) requires the party opposing summary judgment to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." *Id.* As Plaintiff's response to Defendants' motion for summary judgment did not address the excessive force claim, Plaintiff has not disputed Professor Ross's qualification as an expert. Professor Ross stated that in his opinion the force used by Defendants in their overall response, in the house, on the way to the patrol car, in the effort to search Plaintiff, and in the effort to re-cuff Plaintiff, was objectively reasonable. (Ross Report 5-10.) As to the specific use of hypoglossal nerve pressure, Professor Ross stated that this technique has been taught in police academies since the 1970s and that Defendants properly applied the technique in this case. (*Id.* at 8-9.) As to the use of the pepper spray, Professor Ross stated that the use of the pepper spray was reasonable given that the other efforts that Defendants had made to subdue Plaintiff had been unsuccessful. (*Id.* at 9.)

From the outset of Deputy Wright's encounter with Plaintiff, Plaintiff was not cooperative.  Inside the house Plaintiff demonstrated some skill in close combat when he escaped Deputy Wright's grip and then assumed a defensive stance.  Deputy Wright was confronted with an agitated person based on Plaintiff yelling at his mother and Deputy Wright.  The force used by Defendants during the initial encounter in the house and then in placing Plaintiff in the patrol car was only that which was necessary to place Defendant under arrest and then to place him in the patrol car.  Although Plaintiff has indicated that he moved the hand-cuffs between his legs because he was experiencing discomfort, Defendants were nonetheless confronted with Plaintiff's non-compliance.  In consideration of the events in the house, it was objectively reasonable for Defendants to take Plaintiff to the ground when it appeared that Plaintiff was going to strike Deputy O'Rourke.  Beyond the normal threat posed by an individual striking someone, the hand-cuffs, which were then attached to only one arm, provide Plaintiff with a weapon that could inflict substantial injury.  Once on the ground Plaintiff failed to comply with repeated commands from Defendants.  As Plaintiff did not respond to Professor Ross's report, the un-rebutted evidence presented for summary judgment is that hypoglossal nerve pressure is a long-accepted pressure point control tactic.  Deputy Wright only applied this technique after Plaintiff failed to comply with Defendants' repeated requests.  In this context Deputy Wright's use of hypoglossal nerve pressure was objectively reasonable.  Plaintiff did not comply with Defendants' requests in response to the hypoglossal nerve pressure, so Defendants sprayed Plaintiff with

pepper spray.  In consideration of the ongoing struggle on the ground and the prior effort

to use a pressure point control tactic, Defendants' use of pepper spray was objectively

reasonable.

Plaintiff has not offered any medical evidence of injuries from the force used by

Defendants and did not request medical attention while he was at the hospital for the blood

draw to determine his blood-alcohol level.  In this context, the Court notes a point the Sixth

Circuit recently reiterated in the context of analyzing an excessive force claim under the

Fourteenth Amendment's Due Process Clause, that the Constitution is not a "'font of tort

law' that the federal courts 'superimpose[] upon whatever systems' the States already have."

*Leary v. Livingston County*, -- F.3d --, 2008 WL 2340231, at *5 (6th Cir. 2008)

(modification in *Leary*) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).  As the Sixth

Circuit indicated in *Leary*, though not dispositive, it is relevant to consider the absence of

hospital and doctor's visits.  *Id.* at *3.  The absence of such medical evidence is consistent

with Defendants' use of force being objectively reasonable.

Defendants are entitled to qualified immunity on Plaintiff's excessive force claim as

in each instance where force was used, the use of force was objectively reasonable.

**B.    Plaintiff's State-Law Assault and Battery Claim**

Under Michigan law, "an arresting officer may use such force as is reasonably

necessary to effect a lawful arrest."  *Young v. Barker*, 158 Mich. App. 709, 723, 405

N.W.2d 395 (1987).  Defendants contend that based on Professor Ross's expert report the

force used was reasonably necessary.  Plaintiff's response to Defendants' motion for summary judgment did not discuss Plaintiff's assault and battery claim.  As the Court has already analyzed, there is not a genuine issue of material fact as to Defendants' use of force having been objectively reasonable.  *See supra* Part III.A.2.

## C.    Plaintiff's State-Law False Arrest Claim

Under Michigan law, in order for a plaintiff to prevail on a false arrest claim the plaintiff must show that the arrest was not based on probable cause.  *Young*, 158 Mich. App. 400-01 (citing *Brewer v. Perrin*, 132 Mich. App. 520, 527, 349 N.W.2d 198 (1984)). Defendants contend that Plaintiff's false arrest claims must fail because they had probable cause. Plaintiff's response to Defendants' motion for summary judgment did not discuss Plaintiff's false arrest claim.  Defendants contend that their testimony establishes that they had probable cause.  Defendants further contend that this is buttressed by the state district court judge finding probable cause for the felony resisting arrest charge at Plaintiff's preliminary exam and by Plaintiff pleading guilty to the operating while impaired charge. (Def.'s Mot., Ex. H, Preliminary Exam. Tr. 43:6-11.)   Plaintiff had counsel at the preliminary examination and had a full and fair opportunity to litigate the question of probable cause at th preliminary examination.  (Preliminary Exam. Tr. 3:3-7, 29:6-41:19.) Therefore,  Plaintiff is precluded from arguing that Defendants lacked probable cause based on the judge at the preliminary examination having found that there was probable cause to charge Plaintiff.  *Gaddis v. Redford Twp.*, 188 F. Supp. 2d 762, 770 (E.D. Mich. 2002); *White v. Tamlyn*, 961 F. Supp. 1047, 1054-55 (E.D. Mich. 1997).

**D.  Plaintiff's State-Law Intentional Infliction of Emotional Distress Claim**

Under Michigan law a claim of intentional infliction of emotional distress requires proof of four elements: "(1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) 'severe emotional distress.'"  *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905 (1985) (quoting *Ross v. Burns*, 612 F.2d 271, 273 (6th Cir. 1980)).  The "extreme and outrageous" conduct element requires proof of conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 603 (quoting *Restatement (Second) of Torts* § 46 cmt. d)).  Defendants contend that Plaintiff has not identified any conduct that rises to the level required to satisfy this first element.  Plaintiff contends that the violation of his constitutional rights constitutes the extreme and outrageous conduct.  As the Court has determined that there was no constitutional violation as to the use of force and Deputy O'Rourke's entry and that the law was not clearly established with respect to Deputy Wright's entry, the constitutional violations alleged by Plaintiff cannot constitute extreme and outrageous conduct.  In the absence of any "extreme and outrageous" conduct, Plaintiff's intentional infliction of emotional distress claim fails as a matter of law.

**IV.**

The Court has determined that Defendants are entitled to qualified immunity on Plaintiff's unlawful entry and excessive force claims.  Additionally, the Court has

determined that Defendants are entitled to summary judgment on Plaintiff's state-law claims. As Deputy Wright is entitled to qualified immunity for his entry into Plaintiff's house, Plaintiff's motion for summary judgment will be denied.  As Defendants are entitled to qualified immunity on Plaintiff's constitutional claims and Defendants are entitled to summary judgment on Plaintiff's state-law claims, Defendants' motion for summary judgment will be granted.  A judgment will be entered consistent with this opinion.

Date:   _____June 30, 2008_____      /s/ Robert Holmes Bell_____
                                        ROBERT HOLMES BELL
                                        CHIEF UNITED STATES DISTRICT JUDGE